# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　　　　Respondent,<br><br>　　　v.<br><br>K.A.B.,<br><br>　　　　　　　　　Appellant. | No. 51051-1-II<br>(consolidated with No. 52921-1-II)<br><br><br>ORDER GRANTING MOTION TO<br>PUBLISH AND PUBLISHING OPINION |

APPELLANT K.A.B. filed a motion to publish this court's opinion filed on August 25, 2020. After consideration, the court grants the motion. It is now

**ORDERED** that the final paragraph in the opinion which reads "A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered." is deleted. It is further

**ORDERED** that the opinion will now be published.

**PANEL:** Jj. Worswick, Lee, Cruser

**FOR THE COURT:**

_____
CRUSER, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51051-1-II |
| Respondent, | (consolidated with No. 52921-1-II) |
| v. | |
| K.A.B., | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — K.A.B. seeks reversal of her custodial assault conviction, both through a personal restraint petition and a direct appeal, which we have consolidated for review.

In her direct appeal, K.A.B. argues that the juvenile court erred because (1) it misapprehended the law on juvenile capacity, (2) the juvenile court's finding that K.A.B. had the capacity to commit a crime was not supported by substantial evidence, (3) the finding that K.A.B. had the intent to commit custodial assault was not supported by substantial evidence because K.A.B. suffered from diminished capacity due to the dosage of fluoxetine (Prozac) she was taking at the time of the custodial assault, (4) the conclusion that the detention officer was acting within the scope of her "official duties" was not supported because the restraints she used against K.A.B. were excessive under the circumstances, and (5) the juvenile court should have considered whether K.A.B. was acting in self-defense.

In a personal restraint petition (PRP), K.A.B. raises a claim of ineffective assistance of counsel based on various instances of alleged deficient performance, including that counsel failed to adequately prepare and present a diminished capacity defense. She argues that no legitimate trial strategy can account for counsel's errors and that she suffered prejudice. K.A.B. also claims that the juvenile court erred in finding capacity, and that the juvenile court judge violated the appearance of fairness doctrine and should have recused himself.

With regard to her direct appeal, we hold that the juvenile court misapprehended the law on juvenile capacity and applied an incorrect standard when it determined that K.A.B. had capacity to commit a crime under RCW 9A.04.050. On remand, the juvenile court is instructed to hold a new capacity hearing applying the correct standard. We further hold that (1) on the record before the juvenile court, the evidence is sufficient to sustain the finding that K.A.B. had the intent to commit custodial assault, (2) the conclusion that the detention officer was acting within the scope of her official duties was supported by the unchallenged finding of fact, and (3) the juvenile court had no duty to *sua sponte* consider whether K.A.B. was acting in self-defense.

With regard to her PRP, we hold that K.A.B. received ineffective assistance of counsel because her trial counsel failed to adequately prepare and present a diminished capacity defense. Accordingly, we reverse K.A.B.'s conviction and remand to a different judge for further proceedings consistent with this opinion.

FACTS

I. BACKGROUND

K.A.B. lived with her maternal grandmother who became her adoptive parent after K.A.B.'s biological parents had their parental rights terminated. K.A.B.'s early childhood was

3

"marred by her parents' problems with mental illness, substance abuse, and domestic violence." Clerk's Papers (CP) at 52. Since 2013, K.A.B. has received mental health counseling. In 2016, K.A.B. was admitted to Grays Harbor Community Hospital on several occasions related to behavioral issues that included threatening conduct and suicidal ideations. K.A.B. had previously "exhibited severe, recurrent temper outbursts [that] manifested verbally," and these outbursts were "inconsistent with her developmental level." *Id.* at 53. After an inpatient stay at Seattle Children's Hospital, K.A.B. was diagnosed with oppositional defiant disorder (ODD), attention-deficit/hyperactivity disorder (ADHD), and possible posttraumatic stress disorder (PTSD) stemming from her "history of abuse and neglect while living with her biological parents." *Id.* K.A.B. was prescribed a 40 mg dose of fluoxetine, commonly known by its brand-name Prozac, and guanfacine.

On January 31, 2017, when K.A.B. was 11 years old, she was charged with two counts of second degree assault against her maternal grandmother, each with deadly weapon enhancements. K.A.B. was placed in the Grays Harbor Juvenile Detention facility to await adjudication of these charges.

While in detention, K.A.B.'s mental health condition continued to affect her. She had approximately 11 incident reports filed on her for behaviors that included name calling, throwing food, and not following directions. K.A.B. had also experienced suicidal episodes while in the detention center on at least five occasions where mental health professionals were involved. At a pretrial hearing on April 20, 2017, the State informed the juvenile court that detention center staff were worried about K.A.B.'s behavior and asked that the juvenile court set up a psychiatric appointment for her.

4

II. MARCH 3 INCIDENT

During class time at the detention center, K.A.B. was not cooperating with Linda Hayes, the detention center teacher, because she did not want to do her online schoolwork but wanted to work on a crossword puzzle instead. Hayes attempted to redirect K.A.B. to do the online schoolwork, but K.A.B. refused and "became angry." Verbatim Report of Proceedings (VRP) (June 16, 2017) at 70-71. K.A.B. was writing swear words on her paper, refused to give her pencil to Hayes, and "[h]er general body language said that she was not happy." *Id.* at 71. Hayes asked K.A.B. to leave the room, but K.A.B. refused. After a short attempt to get K.A.B. to leave the room, Hayes called the detention staff to remove K.A.B. from the classroom because she "was concerned that [K.A.B.] was going to continue to get upset." *Id.*

Detention Officer (DO) Georgia Peterson arrived at the classroom with another DO and saw that "it was pretty quiet, [K.A.B] was playing with some papers on her desk." *Id.* at 86. K.A.B. continued to refuse to leave the classroom or to make any attempt to stand up and leave on her own, and K.A.B. told Peterson that her voice "was the last voice she wanted to hear." *Id.* at 86-87. Hayes asked the other students in the classroom to move to the other side of the room for safety, and Peterson and the other DO each grabbed one of K.A.B.'s arms, holding K.A.B. in the escort position, and escorted her out of the classroom. When they arrived at the intake room, Peterson and the other DO placed K.A.B. on the bench in one handcuff and cuffed her to the cuff bar.

After Peterson and the other DO restrained K.A.B. at the cuff bar, they left K.A.B. alone in the intake area. Detention staff were working on other tasks when Peterson saw on the security camera that K.A.B. was not on the bench and had gotten out of the handcuff.

5

When Peterson went back into the intake room with DO Joshua Dick, K.A.B. was holding something in her hand and the detention officers verbally directed K.A.B. to set the object down and sit back on the bench. K.A.B. was in the storage area when Dick and Peterson returned to the intake room. The security video confirmed that K.A.B. had been calmly walking about the intake room and had wandered into the storage area shortly before the DOs arrived.

While in the storage area, both Dick and Peterson grabbed K.A.B.'s arms and moved K.A.B. to the bench where they restrained K.A.B. in cuffs behind her back. While Dick attempted to apply the leg restraints, K.A.B. was kicking and resisting the restraints. Peterson held K.A.B.'s legs by the knees and had pulled her close to prevent her kicking. K.A.B.'s face was about one and a half feet away from Peterson's when K.A.B. spit on Peterson's face. Peterson then pushed K.A.B.'s face away toward the wall and a third DO came to assist in restraining K.A.B.'s head against the bench. Peterson retrieved a spit mask that completely shrouded K.A.B.'s face and applied it to K.A.B. to prevent her from spitting again.

K.A.B. apparently continued to swear, refused to comply with verbal instructions, and struck the back of her head against the wall behind her while fully restrained and with the mask covering her face. The three DOs then moved K.A.B. from the bench to a restraint chair. Peterson testified that K.A.B. made threats to kill her while the three DOs were moving K.A.B. from the bench to the restraint chair. Dick also testified that while K.A.B. was sitting back on the bench after the second attempt to restrain her, K.A.B. made threats towards staff and threats of self-harm. K.A.B. was unable to recall what happened in the time between Peterson and Dick retrieving her from the storage room and placing her in the restraint chair. On March 8, the State charged K.A.B. with custodial assault under RCW 9A.36.100(1)(a).

6

II. PRETRIAL EVENTS

A. CAPACITY DETERMINATION

The juvenile court held a capacity hearing on the custodial assault charge. Defense counsel retained Dr. Fran Lexcen from the Child Study and Treatment Center (CSTC) to conduct a forensic evaluation on K.A.B.'s juvenile capacity. Dr. Lexcen described K.A.B.'s background as including a "home environment of neglect, abuse[,] and domestic violence," and she acknowledged that there was "an ongoing conflict about who will be [K.A.B.'s] guardian and where she will live if she is released. Thus, [K.A.B.] has lived and is living in an environment of stress and persistent uncertainty." CP 56. The report described K.A.B.'s behavioral problems that "date back to at least early elementary school and are extraordinary in that they are so extreme and violent. It appears that she has limited control of her conduct when she is upset." *Id.*

Dr. Lexcen evaluated factors from the Supreme Court's decision in *State v. J.P.S.*, 135 Wn.2d 34, 37, 954 P.2d 894 (1998), that bear on whether a child has capacity to commit a crime. She determined that while some of the factors (such as whether the child exhibited a desire for secrecy or admonished the victim not to tell) were not relevant to this case, the others tended to demonstrate that K.A.B. was aware of the wrongfulness of her conduct. In particular, Dr. Lexcen's report noted that K.A.B.'s academic performance and cognitive functioning were consistent for her age, though she may have some limitations in language processing and social communication. However, these limitations did not reveal any delayed or immature development. In addition, K.A.B. had previously been suspended from school for spitting, and records indicate she had previously attempted to spit on hospital staff. Finally, K.A.B. stated during the incident that "she would rather go to prison than be moved to Arizona," which Dr. Lexcen interpreted as

7

demonstrating awareness "that her behaviors were likely [sic] result in punishment." CP at 60. However, when asked to describe the incident, "[K.A.B.] spontaneously offered the information that she had merely been sent to the hospital after she had been charged with assault in the past." *Id.* Dr. Lexcen explained that this statement indicates that K.A.B. expected an outcome less severe than an assault charge.

The parties stipulated to admission of Dr. Lexcen's report. Defense counsel argued that "custodial assault requires an intent" and "it's unclear on whether she did have the required intent to commit the act in general." VRP (Apr. 6, 2017) at 33. In addition, defense counsel argued that K.A.B.'s prior consequences for similar conduct included suspension from school, which K.A.B. might have interpreted as being a reward as opposed to a negative consequence, and therefore, she lacked an ability to understand that her conduct was wrongful.

The juvenile court disagreed and stated that it believed that criminal intent is not relevant to capacity findings. Rather, the juvenile court believed that it was required to determine only whether the child was able to appreciate the wrongful quality of the act when it was committed. Noting specifically that K.A.B.'s thought processes, as described by Dr. Lexcen, were "logical and linear" and that K.A.B. had been suspended for spitting previously, the juvenile court agreed with Dr. Lexcen's conclusion and ruled that there was clear and convincing evidence that K.A.B. had capacity to commit a crime. *Id.* at 41.

B. DESIGNATING DR. JOHN HOLTTUM AS AN EXPERT WITNESS

While in detention, K.A.B.'s maternal grandmother was referred to a psychiatrist, Dr. John Holttum, by a relative, and K.A.B. had begun to receive psychiatric care from him. K.A.B.'s

counsel, Amanda Kleespie, filed a witness list designating Dr. Holttum as an expert witness. Attached to the witness list, Kleespie provided a declaration from Dr. Holttum.

Dr. Holttum's declaration contained information about his qualifications, the fact that he had met with K.A.B., and the fact that his only sources of information were K.A.B. and her maternal grandmother. Dr. Holttum confirmed that he diagnosed K.A.B. with ADHD and PTSD and that he believed K.A.B.'s dosage of fluoxetine, which began at 10 mg, was increased too rapidly to 40 mg. Due to this rapid increase, "the previously reported benefit vanished and [K.A.B.] seemed more volatile than she did before the medication was started. This is a possible side effect of high doses of fluoxetine in children." CP 96. He recommended a dose reduction to test the possibility that the 40 mg dosage of fluoxetine was making K.A.B. experience heightened volatility.

At a hearing on May 11, the State sought a continuance because the State needed time to speak to Dr. Holttum and to determine whether it would need an expert of its own. The juvenile court asked whether Dr. Holttum had provided a report, and Kleespie referred the court to the declaration she filed along with her witness list. Referring to Dr. Holttum's declaration, the juvenile court stated, "[T]his doesn't express any opinions that would be admissible at trial. Does he have some other opinions that you intend to illicit [sic] from him? Why are you calling him as a witness?" VRP (May 11, 2017) at 58. Kleespie replied that she intended to call Dr. Holttum as a witness "[f]or his opinions, based on the reaction now that he has met with [K.A.B.], has changed her medication. . . . And how the medication would have affected her at the time of the trial[1] --

---

[1] Counsel perhaps meant to say "at the time of the incident" rather than "at the time of the trial." VRP (May 11, 2017) at 58-59.

or --" *Id.* at 58-59. The court interrupted, "[T]his doesn't say that." *Id.* The juvenile court elaborated,

> [Y]ou need to come up with more information than that. You can't expect the State to deal with that kind of a defense without letting them know what your expert's opinions -- there are no opinions in here. This is all about treatment. If you want this doctor to be permitted to testify at trial, you need a report from him where he states, in a proper legal format, opinions that would be admissible at trial, that in some relevant way, address an element of the crime.

*Id.* at 59. Kleespie confirmed that she could obtain such an opinion in one week, and so the juvenile court granted the State's motion to continue.

However, by the time the juvenile court reconvened on the matter three weeks later, Kleespie had not obtained a forensic report. Instead, Kleespie provided two progress notes from Dr. Holttum's appointments with K.A.B. Kleespie requested a continuance of the trial until Dr. Holttum was available to testify over the phone. In addressing counsel's request, Kleespie and the juvenile court had the following exchange:

> THE COURT: What do you expect to be the primary issue that Dr. Holttum will address in his testimony?
> KLEESPIE: It's anticipated that he will testify regarding her medications that she was on at the time of the incident. He has since changed her medication based on the levels that she was having. He has indicated in his those reports that I provided to the State, that the medication that she was on at the time, the levels that she was on at the time, would have caused additional aggression and hostility, and so that's the testimony that we intend to illicit [sic].
> THE COURT: How is that a defense to this charge?
> KLEESPIE: Because by having the extra hostility for the medication, would have exacerbated the situation on [K.A.B.'s] part.
> THE COURT: But what's the legal defense? I don't understand, is it insanity? What's the defense?
> KLEESPIE: The defense would essentially be a type of diminished capacity, as far as the medication caused exacerbation of the situation.
> THE COURT: But he doesn't say that in here.
> KLEESPIE: But that's what the medication result would be, though.
> THE COURT: But it doesn't say that in the report. You have asked for a continuance several weeks ago, and all I have been provided, are what amount to

10

> notes from patient visits that he has had, not any kind of a forensic analysis, one is dated April four, one is dated May ten, and here we are June 7, and you don't have any kind of a report that sets forth opinions that are relevant to the charge pending against [K.A.B.] that you are able to provide to the prosecutor. I don't know how you -- why should I continue this case based on a progress note that's two months old?
>
> KLEESPIE: The progress note, the key that we are focusing on, is actually the last page of the progress note, the 606, which is why he changed the medication, which was because of the additional hostility. And so that's what we -- what I planned on eliciting during testimony, was the effects of the medication.

VRP (June 7, 2017) at 3-4. The juvenile court agreed to continue the trial one week to allow for Dr. Holttum's testimony, but it admonished counsel that unless Dr. Holttum testified to "legal opinions that he is prepared to offer on a more probable than not basis that go to a material element of the crime charged," then his testimony will not be relevant. *Id.* at 5. If, however, Dr. Holttum did present relevant testimony, then the court would continue the trial further to allow the State to respond.

### III. TRIAL

Dr. Holttum testified at K.A.B's trial, explaining that K.A.B. met diagnostic criteria for PTSD and "the history [he] got had a timeline of increased volatility, embolden [sic] behavior, explosive rages," which "seemed to have gotten worse since [K.A.B.] reached the higher dose of [f]luoxetine," which increased from 10 mg to 40 mg in about three months. VRP (June 21, 2017) at 106. He further explained that approximately 10 percent of young people experience these symptoms when taking fluoxetine, so Dr. Holttum "performed the hypothesis that the [f]luoxetine was increased too quickly, and got to a dose that made those symptoms worse." *Id.* Dr. Holttum had a follow-up appointment with K.A.B. the day before giving his testimony and saw that K.A.B. appeared to be stabilizing; there had been no significant outbursts since he reduced K.A.B.'s fluoxetine dose back to 10 mg. Because he had not had enough time to see K.A.B. on the lower

11

dose, he could not make a more firm conclusion regarding his hypothesis until he had an opportunity to observe K.A.B. outside the detention setting for a longer period of time.

Dr. Holttum also explained that limit setting or demands tend to be a trigger for K.A.B. However, the triggers that set off a reaction in K.A.B. are separate from "the reason that they are so intense and irrational" because "[f]luoxetine and all the [selective serotonin reuptake inhibitors] make explosiveness, agitation, mood swings, those sorts of things worse in about ten percent of kids." *Id.* at 111. So while Dr. Holttum could not testify that the fluoxetine dosage was "entirely responsible" for K.A.B.'s conduct, because "[K.A.B] had a history of oppositional behavior and PTSD symptoms extending back before the Prozac was ever started," he clarified his hypothesis that the medication was making K.A.B.'s outbursts "worse, more frequent, and more intense." *Id.* The distinction between the guanfacine that Dr. Holttum increased, and the fluoxetine, which he reduced, is that "the frequency of the outbursts is more likely to be affected by the [g]uanfacine, and the intensity of the ones that do happen is more likely to be a by-product of reducing the [f]luoxetine." *Id.* at 113. When the State asked whether, "with a reasonable degree of medical certainty . . . the [f]luoxetine caused respondent to spit in an officer's face," Dr. Holttum began to explain that he did not think that could be determined when the State interrupted his response and ended the questioning. *Id.* at 113-14.

On redirect, Kleespie asked Dr. Holttum whether it could be determined that the higher dose of fluoxetine "could have caused increase [sic] volatility, which could have amounted to the spitting?" *Id.* at 114. Dr. Holttum explained that "it's very likely that it contributed to the intensity of that episode, but whether it's the thing that made her express anger in that particular way, nobody can determine that." *Id.* at 114-15.

12

In rendering its decision, the juvenile court recognized that no one disputed the fact that K.A.B. spit on the DO. But as to the issue of diminished capacity, the juvenile court identified K.A.B.'s failure to produce any testimony from Dr. Holttum that was relevant to her charge. The juvenile court explained that Dr. Holttum "simply did not address whether or not she had a diminished capacity to form a criminal intent by reason of the medication she was taking." *Id.* at 123. The juvenile court also found that at the time of the assault, Peterson was performing her official duties as a detention officer. Because the juvenile court was "not convinced that [K.A.B.] suffered from diminished capacity at the time that the assault was committed" and because "[t]here is no other defense being offered," the juvenile court found K.A.B. guilty of custodial assault under RCW 9A.36.100(1)(a). *Id.*

K.A.B. was sentenced to 30 days confinement, which she had already served by disposition of the case, and 12 months community supervision. In addition to other community supervision conditions, K.A.B. was ordered to obtain a mental health evaluation and to comply with the treatment plan. K.A.B. will be eligible for administrative sealing of her record on January 11, 2024.

IV. DIRECT APPEAL AND PERSONAL RESTRAINT PETITION

K.A.B. appeals the juvenile court's finding of capacity and the finding of guilt. In addition, K.A.B. filed a PRP asserting that she received ineffective assistance of counsel, that the juvenile court erred in finding capacity, and that the juvenile court judge violated the appearance of fairness doctrine and should have recused himself. We consolidated K.A.B.'s direct appeal with her PRP.

In support of her PRP, K.A.B. attached a memorandum[2] from Professor John Strait from Seattle University School of Law to her petition. The memorandum from Strait contains his legal opinion that K.A.B. was deprived of effective assistance of counsel.

In addition, K.A.B. provided a declaration from Dr. Eric Trupin, a child clinical psychologist, who is also the Director of the Division of Public Behavioral Health and Justice Policy and a Professor and Vice Chair for the Department of Psychiatry & Behavioral Sciences at the University of Washington School Of Medicine. Dr. Trupin reviewed records, including (1) the video recording of the incident, (2) the report of proceedings at trial, (3) the forensic mental health evaluations conducted by Dr. Lexcen,[3] and (4) Dr. Holttum's declaration that was submitted to the juvenile court. Dr. Trupin concluded that K.A.B. did not have capacity to reflect on the consequences of her behavior due to a mental disorder, this mental disorder prevented K.A.B. from forming intent to commit a felony, and Grays Harbor detention staff violated the center's own policies when they restrained K.A.B. by cuffing her to the cuff bar.

K.A.B. also included a declaration from Dr. Holttum in her PRP in which he discussed his pretrial communications with Kleespie, K.A.B.'s counsel. Dr. Holttum could not recall communicating with Kleespie either by e-mail, on the phone, or in person, and Kleespie did not provide him with any records to review before he gave his testimony, including any of the CSTC

---

[2] As we note elsewhere, the document prepared by Strait is not a declaration. It is not made under the penalty of perjury and does not comply with RCW 9A.72.085. As such, it is neither competent nor admissible evidence.

[3] Dr. Lexcen conducted a competency evaluation in addition to the capacity evaluation and concluded that K.A.B. was competent to stand trial. K.A.B. stipulated to the conclusions in that report.

reports or the video recording of the incident. Dr. Holttum also described the progression of his visits with K.A.B. both before and after trial, noting that after he reduced K.A.B.'s dosage of fluoxetine to 10 mg, K.A.B. did not experience any incidents of explosive anger. Dr. Holttum was provided with Dr. Trupin's declaration before he wrote his own, and he agreed with all of Dr. Trupin's conclusions.

## DISCUSSION

### I. DIRECT APPEAL

#### A. JUVENILE CAPACITY

K.A.B. argues that the juvenile court misapprehended the law on juvenile capacity when it explained that a child's ability to entertain criminal intent is not relevant to its determination. We hold that the juvenile court misinterpreted the law on juvenile capacity and therefore applied an incorrect standard when it found K.A.B. had capacity to commit a crime. Although the State is not required to prove that the child had actual knowledge of the legal consequences of her conduct, the State must show that the child is able to entertain criminal intent. *State v. Ramer*, 151 Wn.2d 106, 115, 86 P.3d 132 (2004).

A child over 8 years old and under 12 years old is presumed incapable of committing a crime. RCW 9A.04.050. Known as "the infancy defense," this presumption serves to "'protect from the criminal justice system those individuals of tender years who are less capable than adults of appreciating the wrongfulness of their behavior.'" *Ramer*, 151 Wn.2d at 114 (quoting *State v. Q.D.*, 102 Wn.2d 19, 23, 685 P.2d 557 (1984)). This presumption may be rebutted by evidence that the child had capacity to (1) understand the act charged and (2) to know that it was wrong. RCW 9A.04.050.

15

The State bears the burden of overcoming the presumption by clear and convincing evidence. *J.P.S.*, 135 Wn.2d at 37. Clear and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

In determining capacity, the juvenile court engages in a fact-specific inquiry that "must be in reference to the specific act charged." *Ramer*, 151 Wn.2d at 114. The child must be aware that the act was wrongful at the time it was committed; it is not enough to show that the child appreciated the wrongfulness of their conduct after the fact. *J.P.S.*, 135 Wn.2d at 37-38.

Courts weigh seven factors to determine whether a child knew that the act charged was wrong:

> (1) the nature of the crime; (2) the child's age and maturity; (3) whether the child showed a desire for secrecy; (4) whether the child admonished the victim not to tell; (5) prior conduct similar to that charged; (6) any consequences that attached to the conduct; and (7) acknowledgment that the behavior was wrong and could lead to detention.

*Id.* at 38-39. In *J.P.S.*, our Supreme Court reversed the appellate court's holding that the child must not only appreciate that the act was wrongful but must also understand that the act is punishable in court. *Id.* at 38. Drawing on the language of former RCW 9A.04.050 (1975), the court held that the legislature did not impose an additional requirement on the State to demonstrate that the child knew their act was illegal. *Id*. The relevant inquiry is only whether the child had capacity to know that what they did was *wrong*, following from a consideration of the seven factors. *Id*.

But later, in *Ramer*, the court held that

> [c]apacity requires the actor to understand the nature or illegality of his acts. In other words, he must be able to entertain criminal intent. A "sense of moral guilt alone, in the absence of knowledge of legal responsibility, is not sufficient," although actual knowledge of the legal consequences is not necessary.

151 Wn.2d at 115 (quoting 43 C.J.S. *Infants* § 197 (1978)).

*Ramer* and *J.P.S.* both involved allegations of sexual misconduct by the juvenile defendant, and, as the Supreme Court has observed, "it is more difficult for the State to prove the child understood the conduct was wrong" in such cases. *Ramer*, 151 Wn.2d at 115 (quoting *J.P.S.*, 135 Wn.2d at 38). The court in *Ramer* held that as a result, where a child is charged with a sex crime, "the State carries a greater burden of proving capacity, and must present a higher degree of proof that the child understood the illegality of the act." *Id*. While it may be more difficult for the State to meet its burden in sexual misconduct cases, this language does not limit application of this requirement to sexual misconduct cases. Rather, the court described this requirement in the context of sexual misconduct cases because the nature of that crime creates a greater chance that the child may not have understood that the actions were wrongful unless the State also shows that the child could entertain criminal intent at the time. *Id*.

Following the court's holding in *Ramer*, the State must demonstrate, by clear and convincing evidence, that a child not only knew the act was wrong in a moral sense, but in a legal sense as well. *Id*. at 114-15. The child "must be able to entertain criminal intent." *Id* at 115. There remains no requirement that the State show that the child understands the specific legal consequences they face for committing the act; for example, that there may be court proceedings or that the act is a felony as opposed to a misdemeanor. Nor does the State have a burden to prove that the child actually acted with criminal intent at this stage in the proceedings. However, a showing that the child understood her actions were merely morally wrong is insufficient to sustain a capacity finding.

When the juvenile court announced its decision on capacity, it stated,

17

> The legal test is really pretty simple on capacity. And, that is whether or not the juvenile appreciated the wrongful quality of the act at the time that it was committed. It doesn't require the Court to engage in determining whether there is proof beyond a reasonable doubt of any of the elements of the crime, intent has -- criminal intent has nothing to do with capacity findings, it's strictly a matter of whether or not a child less than 12 years old had an appreciation of the wrongful quality of the act at the time that it was committed.

VRP (Apr. 6, 2017) at 39. The juvenile court made this statement in response to K.A.B.'s counsel's comment during argument that in order to commit custodial assault, K.A.B. must have criminal intent, and it is unclear "whether she did have the required intent to commit the act in general." *Id.* at 33.

While the juvenile court was correct to state that it is not required to determine whether K.A.B. actually acted with criminal intent at this stage of the proceedings, it erred when it said that "criminal intent has nothing to do with capacity findings." *Id.* at 39. This assertion runs counter to the *Ramer* court's holding that a child must be shown to *have an ability* to form criminal intent. 151 Wn.2d at 115.

Accordingly, the juvenile court misapprehended the law in light of the rule announced in *Ramer*. *Id*. The juvenile court should have considered whether the State provided clear and convincing evidence that K.A.B. was able to form criminal intent and had a general knowledge of legal responsibility.

18

B. THE EVIDENCE, ON THIS RECORD, IS SUFFICIENT TO SUSTAIN THE JUVENILE COURT'S FINDING THAT K.A.B. HAD THE REQUISITE INTENT TO COMMIT CUSTODIAL ASSAULT[4]

K.A.B. argues that the evidence is insufficient to sustain the juvenile court's finding that she had the requisite intent to commit custodial assault. This is so, she argues, because she suffered from diminished capacity due to her mental health condition and the dosage of fluoxetine she was taking at the time. She argues that the fluoxetine magnified the intensity of her reaction to the officers' attempt to restrain her and she did not act with intent when she spit on Peterson. K.A.B. asserts that Dr. Holttum's testimony was sufficient to substantiate a diminished capacity finding and the juvenile court erred in rejecting her defense.

We hold that based on the record before us, we cannot say that the juvenile court improperly rejected K.A.B.'s diminished capacity defense or that the evidence was insufficient to sustain the juvenile court's finding that K.A.B. acted with intent. While Dr. Holttum testified regarding the possible effects of fluoxetine on K.A.B., Dr. Holttum never established a connection between the side effects of the medication and K.A.B.'s ability to form intent to commit custodial assault. Nor did Dr. Holttum present any testimony regarding the impact of K.A.B.'s mental health condition on her ability to form intent.

When determining whether the evidence presented at trial is sufficient to support a criminal conviction, we will consider "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019) (internal

---

[4] Although we reverse and remand for a new trial, we address this argument because if the evidence is insufficient, the remedy is reversal and dismissal. *State v. DeVries*, 149 Wn.2d 842, 853, 72 P.3d 748 (2003) ("A defendant whose conviction has been reversed due to insufficient evidence cannot be retried.") (citing *State v. Anderson*, 96 Wn.2d 739, 742, 638 P.2d 1205 (1982)).

quotation marks omitted) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion) (emphasis omitted)). All reasonable inferences arising from the evidence are drawn in favor of the State and interpreted against the defendant. *Id.*

A defendant who intends to pursue a diminished capacity defense must present testimony from an expert that demonstrates "a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged." *State v. Atsbeha*, 142 Wn.2d 904, 921, 16 P.3d 626 (2001). Evidence that the defendant suffered from a mental disorder is insufficient to establish diminished capacity. *Id.* Rather, "[t]he diagnosis must, under the facts of the case, be capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime. The opinion concerning a defendant's mental disorder must reasonably relate to impairment of the ability to form the culpable mental state to commit the crime charged." *Id.*

Dr. Holttum's testimony did not satisfy the requirement to maintain a diminished capacity defense set forth in *Atsbeha*. *Id.* He testified that K.A.B. suffered from a mental disorder and that K.A.B.'s volatility and explosive rages were likely aggravated by the high dosage of fluoxetine. But it is not enough to show that K.A.B. suffered from a mental disorder or that she suffered from intensified rage due to her medication; the expert must provide an opinion that allows the trier of fact to determine whether these conditions affected K.A.B.'s ability to form the culpable mental state at the time of the crime. *See Atsbeha,* 142 Wn.2d at 421. Dr. Holttum did not provide such testimony. Consequently, we cannot say that the juvenile court erred in rejecting her diminished capacity defense.

Based on this record, a rational finder of fact could have found that K.A.B. intentionally spit on Peterson. *See Scanlan*, 193 Wn.2d at 770. The evidence before the juvenile court was therefore sufficient to support K.A.B.'s conviction. However, as we discuss below, K.A.B. received ineffective assistance of counsel due to her counsel's failure to adequately prepare and present the diminished capacity defense.

C. THE UNCHALLENGED FACTUAL FINDING SUPPORTS THE JUVENILE COURT'S CONCLUSION THAT THE DO WAS ACTING WITHIN THE SCOPE OF HER OFFICIAL DUTIES

K.A.B. assigns error to the juvenile court's conclusions of law 2a, 2b, and 2c, arguing that the evidence demonstrates that the DO was not acting within the scope of her official duties during the assault because the use of restraints on K.A.B. was excessive under the circumstances. Conclusion of law 2a states,

> That on or between March 3, 2017, the Respondent assaulted Juvenile Detention Officer (JDO) Georgia Peterson.

Conclusion of law 2b states,

> That at the time of the assault, Georgia Peterson was a Juvenile Detention Officer at a local detention facility.

Conclusion of law 2c states,

> That at the time of the assault, JDO Peterson was performing her official duties as a Juvenile Detention Officer.

CP 167.

Following a bench trial, appellate review of the juvenile court's conclusions of law is limited to whether they are supported by the findings of fact. *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). Where, as here, the findings of fact are not challenged, they are verities

21

on appeal. *Id.* at 106. The conclusions of law K.A.B. challenges are amply supported by the unchallenged finding of fact.

In *State v. Mierz*, 127 Wn.2d 460, 479, 901 P.2d 286 (1995), the court defined "official duties" as "encompass[ing] all aspects of a law enforcement officer's good faith performance of job-related duties." Whether an officer acted within the scope of their "official duties" does not turn on "the propriety or impropriety of an officer's actions in the performance of those duties." *State v. D.E.D.*, 200 Wn. App. 484, 497 n.12, 402 P.3d 851 (2017). So long as Peterson was acting pursuant to her professional role and was not engaged in a "frolic of . . . her own" when the assault occurred, she was performing her official duties. *See State v. Hoffman*, 116 Wn.2d 51, 100, 804 P.2d 577 (1991).

We reject K.A.B.'s challenge to the juvenile court's conclusions of law because the conclusions of law are supported by the unchallenged finding of fact. The relevant finding of fact establishes that Peterson was "a Juvenile Detention Officer (JDO) at the Grays Harbor County Juvenile Detention Facility and was serving in that capacity on March 3, 2017." CP 165. The juvenile court did not find anything that would indicate Peterson was engaged in a "frolic of . . . her own" when she restrained K.A.B. during the assault. *See Hoffman*, 116 Wn.2d at 100. Consequently, the unchallenged finding supports the juvenile court's conclusion that Peterson was acting in her official capacity at the time of the assault.[5]

---

[5] To the extent that K.A.B. bases her challenge to these conclusions of law on information outside the record, specifically on state and national correctional policies regarding the use of restraints on juvenile detainees, this is not a basis on which to undermine a conclusion of law in a direct appeal. None of this information was presented to the juvenile court during the fact-finding phase below. Moreover, we do not consider evidence outside the trial record in a direct appeal. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

D. THE JUVENILE COURT DID NOT ERR WHEN IT DID NOT CONSIDER, *SUA SPONTE*, WHETHER K.A.B. WAS ACTING IN SELF-DEFENSE

K.A.B. claims that "even though the defense attorney did not assert self-defense, the court should have considered it." Br. of Appellant at 40. A defendant is required to point to at least some evidence of self-defense to satisfy the burden of production and merit consideration of the affirmative defense by the trier of fact. *State v. Fisher*, 185 Wn.2d 836, 850-51, 374 P.3d 1185 (2016). However, K.A.B. did not ask the juvenile court to consider self-defense by pointing to evidence below that would have satisfied the burden of production. The only defense K.A.B. offered was diminished capacity.

When a party fails to raise an issue at trial, that party waives their right to challenge the issue on appeal unless the alleged error was a "'manifest error affecting a constitutional right.'" *State v. Kirwin*, 165 Wn.2d 818, 823, 203 P.3d 1044 (2009) (internal quotation marks omitted) (quoting *McFarland*, 127 Wn.2d at 333). In *State v. Bertrand*, we held that the appellant had not met her burden of demonstrating manifest error where "she neither argue[d] nor show[ed]" that the alleged error was manifest, and she thus failed to show that the alleged error had practical and identifiable consequences at trial. 165 Wn. App. 393, 400, 267 P.3d 511 (2011) (citing *State v. Grimes*, 165 Wn. App. 172, 190, 267 P.23d 454 (2011)). Here, K.A.B. does not attempt to make this required showing.

Moreover, K.A.B. has not provided any authority demonstrating that a juvenile court is required to consider self-defense *sua sponte*. Where a party does not provide a citation to authority in support of a proposition, we may assume that none exists. *State v. Arredondo*, 188 Wn.2d 244, 262-63, 394 P.3d 348 (2017). K.A.B. has therefore failed to demonstrate that the juvenile court

erred when it did not, of its own accord, consider whether she may have been acting in self-defense during the assault.

## II. PERSONAL RESTRAINT PETITION[6]

A. PRP PRINCIPLES

To prevail in a PRP, a petitioner must establish (1) a constitutional error that resulted in actual and substantial prejudice or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Dove*, 196 Wn. App. 148, 154, 381 P.3d 1280 (2016). The petitioner must make this showing by a preponderance of the evidence. *Id*.

RAP 16.7(a)(2) requires a petitioner to specifically identify the evidence available to support the factual allegations in the PRP. *In re Pers. Restraint of Wolf*, 196 Wn. App. 496, 503, 384 P.3d 591 (2016). The petitioner must show that she has competent, admissible evidence to establish facts that would entitle her to relief. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013). Conclusory allegations are insufficient. *Wolf*, 196 Wn. App. at 503. In addition, the factual allegations must be based on more than speculation and conjecture. *Yates*, 177 Wn.2d at 18.

We have three options when considering a PRP. First, if a petitioner does not show actual prejudice for constitutional errors or a fundamental defect resulting in a miscarriage of justice for nonconstitutional errors, the petition must be denied. *See id.* at 17; *In re Pers. Restraint of*

---

[6] Under RAP 16.4(d), we may only reach K.A.B.'s PRP if other remedies available to her are inadequate under the circumstances. Because we do not reverse K.A.B.'s conviction on any of the grounds raised in her direct appeal, her direct appeal does not provide an adequate remedy, and we reach the issues raised in K.A.B.'s PRP. *See* RAP 16.4(d).

*Schreiber*, 189 Wn. App. 110, 113, 357 P.3d 668 (2015). Second, if the petitioner has proved actual prejudice or a fundamental defect resulting in a miscarriage of justice, the petition should be granted. *Yates*, 177 Wn.2d at 18. Third, if the petitioner makes at least a prima facie showing but the merits of his or her contentions cannot be resolved solely on the record, we will remand for a full hearing on the merits or a reference hearing. *Id*.

B. ANALYSIS

    1.    INEFFECTIVE ASSISTANCE OF COUNSEL

K.A.B. identifies multiple areas of deficient performance by trial counsel including (1) counsel's failure to adequately present a diminished capacity defense, (2) counsel's failure to request a timely hearing on capacity in her original, dismissed assault case, (3) counsel's failure to obtain an independent expert or present testimony supporting her position on capacity, (4) counsel's decision to file a motion to preclude K.A.B. from seeing her mental health counselor and her grandmother, (5) counsel's offer to discuss a plea agreement with the State prior to receiving any discovery on the case, (6) counsel's failure to investigate the case by not interviewing the detention school teacher and not viewing the video of the incident, (7) counsel's failure to raise self-defense, (8) counsel's failure to challenge the "official duties" element of custodial assault, and (9) counsel's failure to seek the judge's recusal. K.A.B. identifies trial counsel's excessive workload as the cause of her deficient performance and argues that none of these actions can be attributed to tactical decision making. As a result of counsel's performance, K.A.B. claims that her

trial lacked the necessary assurances of fairness, demonstrating that she suffered actual and substantial prejudice and entitling her to collateral relief.[7]

We hold that K.A.B. received ineffective assistance of counsel because her counsel failed to adequately prepare and present the diminished capacity defense. Although K.A.B.'s counsel informed the court of her intent to present a diminished capacity defense, she failed to follow the court's instructions and did not otherwise take the steps necessary to meaningfully present this defense. The deficiencies identified cannot be attributed to trial strategy given counsel's declared intent. K.A.B. was prejudiced by this deficient performance because this was the only defense offered, and there is a reasonable probability that had the juvenile court been presented with an expert opinion demonstrating that K.A.B. lacked criminal intent due to her mental health condition and her dosage of fluoxetine, the result would have been different. Because we resolve this claim on the basis of trial counsel's failure to adequately prepare and present K.A.B.'s diminished capacity defense, we need not consider the additional instances of alleged deficient performance.

---

[7] In support of her ineffective assistance of counsel claims, K.A.B. attaches several items to her petition that we are prohibited from considering because they are neither competent nor admissible as evidence. *See Yates*, 177 Wn.2d at 18. This material includes the memorandum written by Professor Strait, the hearsay on which it relies including e-mail correspondence between K.A.B.'s appellate counsel and her trial attorney, and policies that either contain no indication regarding what they pertain to or that do not appear to have been in effect at a time relevant to this incident. Additionally, even if the memorandum from Strait constituted a sworn declaration, the opinion it offers on whether K.A.B. was denied effective assistance of counsel is not admissible. "Legal opinions on the ultimate legal issue before the court are not properly considered under the guise of expert testimony." *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 344, 858 P.2d 1054 (1993) (emphasis omitted).

26

a.     LEGAL PRINCIPLES

Criminal defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). "Where a defense attorney makes 'errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,' the attorney's performance is constitutionally deficient." *In re Pers. Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 99, 351 P.3d 138 (2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To determine whether counsel's performance was deficient, "[t]he court must engage in a fact-specific inquiry into the reasonableness of an attorney's actions, measured against the applicable prevailing professional norms in place at the time." *Id*.

Review of counsel's performance is highly deferential and we will "strongly presume reasonableness" in order to "combat the biases of hindsight." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). The presumption of reasonableness may be rebutted when a criminal defendant demonstrates "an absence of any legitimate trial tactic that would explain counsel's performance." *Id*. "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (alteration in original) (internal quotation marks omitted)).

If counsel's performance was deficient, we next consider whether the deficient performance caused prejudice. *Lopez*, 190 Wn.2d at 116. "Prejudice exists if there is a reasonable

probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Id.* (quoting *State v. Estes*, 188 Wn.2d 450, 458 395 P.3d 1045 (2017)). A reasonable probability is one that is sufficient to undermine confidence in the trial's outcome, and it is a lower standard than a preponderance standard. *Id.*

An ineffective assistance of counsel claim presents mixed questions of law and fact that we review de novo. *State v. Linville*, 191 Wn.2d 513, 518, 423 P.3d 842 (2018). If the petitioner fails to satisfy one prong of this two-part test, we need not consider the other prong. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012). In the context of a PRP, a petitioner who successfully demonstrates prejudice in an ineffective assistance of counsel claim has necessarily shown actual and substantial prejudice sufficient to obtain collateral relief. *Id.* at 846-47.

> b. FAILURE TO ADEQUATELY PREPARE AND PRESENT THE DIMINISHED CAPACITY DEFENSE

K.A.B. offers two examples of Kleespie's performance in raising the diminished capacity defense that fell below an objective standard of reasonableness. First, K.A.B. claims that Kleespie failed to utilize Dr. Holttum, the expert counsel retained specifically to present the diminished capacity defense, by inadequately preparing him for his testimony and by failing to request that he explain the effect of a high dose of fluoxetine on K.A.B.'s ability to form criminal intent. Second, K.A.B. asserts that Kleespie's performance was deficient because she failed to have an expert witness, whether Dr. Holttum or someone else, conduct an independent forensic evaluation of her mental health condition and explain its impact on her ability to form the culpable mental state.

We hold that K.A.B. received ineffective assistance of counsel because Kleespie failed to understand the legal requirements for presenting a diminished capacity defense, this failure was

not the product of legitimate trial strategy, and the deficient performance prejudiced K.A.B. because diminished capacity was the only defense Kleespie presented to rebut the State's charges.

                i.      FAILURE TO UTILIZE DR. HOLTTUM AS AN EXPERT WITNESS TO ESTABLISH DIMINISHED CAPACITY

Kleespie had an affirmative duty to conduct an investigation of K.A.B.'s case sufficient for her to determine which experts she needed to consult. *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 881, 16 P.3d 601 (2001). Upon determining that a given expert was necessary, Kleespie also had a duty to provide the expert with relevant information that would allow the expert to draw a conclusion. *Id.*

But here, Kleespie failed to provide Dr. Holttum with relevant information he would need in order to make a conclusion regarding K.A.B.'s diminished capacity. Dr. Holttum stated in a declaration provided to the juvenile court that his only sources of information were K.A.B. and her guardian. In the declaration K.A.B. attached to her PRP, Dr. Holttum states that Kleespie did not provide him with the CSTC reports, the report from Columbia Wellness, any records from the juvenile detention facility, or the video of the incident.

During the hearing in which Kleespie sought a continuance of the trial until Dr. Holttum would be available to testify, she stated that she intended to elicit testimony from Dr. Holttum that the high dosage of fluoxetine K.A.B. was prescribed caused K.A.B. to experience excessive aggression and hostility. When pressed by the court as to what the legal defense would be, Kleespie responded, "The defense would essentially be a type of diminished capacity, as far as the medication caused exacerbation of the situation." VRP (June 7, 2017) at 3-4. Prior to this hearing, the juvenile court admonished Kleespie that she must obtain a forensic report from Dr. Holttum that contained an opinion relevant to an element of the crime. At the following hearing, the juvenile

court informed Kleespie that the information she provided, which consisted of two progress notes from K.A.B.'s visits with Dr. Holttum and no forensic analysis, lacked any kind of conclusion relevant to diminished capacity.

The juvenile court explained,

[Y]ou don't have any kind of a report that sets forth opinions that are relevant to the charge pending against [K.A.B] that you are able to provide to the prosecutor. I don't know how you -- why should I continue this case based on a progress note that's two months old?
. . . .
At this point, I will tell you, unless Dr. Holttum comes up with something a whole lot different than what's in this report, his testimony isn't going to take very long, because I am not going to allow him to simply testify about what's in this progress report, because it's not relevant. If he doesn't have legal opinions that he is prepared to offer on a more probable than not basis that go to a material element of the crime charged in this case, he is not testifying.

*Id.* at 4-5. Although specifically informed by the juvenile court on two separate occasions that Dr. Holttum's testimony would be irrelevant unless he could offer a legal opinion on a material element of the crime, Kleespie never asked Dr. Holttum to opine on K.A.B.'s ability to form criminal intent either before or during trial.

Although Kleespie asked Dr. Holttum about K.A.B.'s medication and whether Dr. Holttum had any concerns related to the dosage during his direct examination, she did not ask whether the medication had any impact on K.A.B.'s ability to form criminal intent. On redirect, Kleespie asked, "[I]s it able to be determined that the higher dose could have caused increase [sic] volatility, which could have amounted to the spitting?" VRP (June 21, 2017) at 114. This framing does not pertain to a disputed element of the charged offense nor does it elicit a response that would establish whether K.A.B. could form the culpable mental state.

Counsel's strategic choices will be upheld when they are made after a thorough investigation of the law and facts. *Lui*, 188 Wn.2d at 539. But from the record here, it is apparent that counsel failed to recognize that in order "[t]o maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged." *Atsbeha*, 142 Wn.2d at 914.

Kleespie expressly stated that she intended to raise a diminished capacity defense. Therefore, this is not a situation where the defendant made a deliberate choice to validly waive an available defense. *See State v. Coristine*, 177 Wn.2d 370, 379, 300 P.3d 400 (2013) (holding that while "failure to recognize and raise an affirmative defense can fall below the constitutional minimum for effective representation," the decision to forgo a defense may also be a valid strategic decision). Had counsel made a strategic choice to waive the diminished capacity defense, there would be no reason to call Dr. Holttum as an expert witness or to question him regarding whether the dosage of fluoxetine caused K.A.B. to experience increased volatility.

Rather, though counsel attempted to raise the diminished capacity defense, she failed to do so correctly—despite having been instructed by the juvenile court on the requirements of the defense. There is no strategic justification for trial counsel's failure to provide Dr. Holttum with relevant information or to ask that he opine on K.A.B.'s ability to form intent given the law on diminished capacity and the juvenile court's repeated guidance to Kleepsie about what was required to lay the foundation for this defense. "The Sixth Amendment right to effective assistance of counsel includes expert assistance necessary to an adequate defense." *State v. Punsalan*, 156 Wn.2d 875, 878, 133 P.3d 934 (2006). Here, counsel's failure to utilize Dr. Holttum's expertise in

conducting K.A.B.'s defense fell "well below prevailing professional norms and therefore constitutes deficient performance." *See Lopez*, 190 Wn.2d at 123.

ii. FAILURE TO SEEK A FORENSIC MENTAL HEALTH EVALUATION TO ESTABLISH DIMINISHED CAPACITY

Counsel's performance was also deficient when she failed to obtain an expert evaluation of K.A.B.'s mental health and did not otherwise investigate its impact on K.A.B.'s ability to form the culpable mental state. In *State v. Fedoruk*, 184 Wn. App. 866, 881-82, 339 P.3d 233 (2014), this court held that an attorney's performance was deficient where counsel did not retain an expert to opine on the defendant's mental health condition until the day before jury selection. Counsel's performance fell below an objective standard of reasonableness due to the presence of extensive evidence of the defendant's history of mental illness that was available from the beginning of the representation. *Id.* at 882.

Similarly here, Kleespie was aware of K.A.B.'s history of mental health issues. In the CSTC forensic report created for the initial juvenile capacity determination, Dr. Lexcen noted that K.A.B. had been in counseling since 2013, that she had been diagnosed with ODD, possible PTSD, and ADHD. The report detailed that K.A.B. had previously threatened to commit suicide and was hospitalized at Seattle Children's Hospital on several occasions for "behavioral problems." CP at 52. Dr. Lexcen further noted that K.A.B.'s behavioral problems "are extraordinary in that they are so extreme and violent. It appears that she has limited control of her conduct when she is upset." *Id.* at 56.

K.A.B. continued to exhibit symptoms of her mental health condition while she was in detention, including five occasions during which K.A.B. threatened to commit suicide and mental health professionals had to be called for assistance. At a pretrial hearing that took place several

months before trial, the State informed the juvenile court that staff at the juvenile detention facility reported being "extremely concerned about [K.A.B.]'s behavior." VRP (Apr. 20, 2017) at 49. The extent of this history should have alerted Kleespie to look further into whether it may have impaired K.A.B.'s ability to form the culpable mental state during the incident.

Given Kleespie's intention to pursue a diminished capacity defense, her decision to limit investigation by not seeking a forensic mental health evaluation fell below an objective standard of reasonableness. Defense counsel has an affirmative duty to conduct a reasonable investigation that enables counsel to make informed decisions about how to best represent the client. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 721, 101 P.3d 1 (2004). Counsel's decisions made after a less than complete investigation are reasonable only if the decision to limit the investigation was itself a product of reasonable professional judgment. *Lui*, 188 Wn.2d at 539. Kleespie made the strategic choice to pursue a "type of diminished capacity, as far as the medication caused exacerbation of the situation." VRP (June 7, 2017) at 3-4. The decision to pursue this diminished capacity theory was made without seeking confirmation from a mental health professional that K.A.B.'s ability to form intent was impaired by the dosage of fluoxetine. But corroboration by an expert witness is required to maintain a diminished capacity defense. *Atsbeha*, 142 Wn.2d at 921. The juvenile court noted this deficiency twice, stating that there was no forensic analysis of any kind that was relevant to a material element of the pending charges.

"To provide constitutionally adequate assistance, 'counsel must, at a minimum, conduct a reasonable investigation enabling [counsel] to make informed decisions about how best to represent [the] client.'" *Brett*, 142 Wn.2d at 873 (alterations in original) (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). Counsel here failed to engage in a reasonable

investigation regarding K.A.B.'s mental health condition. This failure prevented counsel from gathering information that would enable her to make informed decisions regarding defensive strategy and from obtaining evidence critical to supporting the argument she did present. Reasonable professional judgment does not support counsel's failure to investigate K.A.B.'s mental health history and counsel's performance was deficient.

### iii.    PREJUDICE

Counsel's deficient performance in failing to adequately investigate and present a diminished capacity defense prejudiced K.A.B. There is a reasonable probability that had Kleespie not made these errors, the result of the proceedings would have been different. *See Crace*, 174 Wn.2d at 840.

The only defense offered by Kleespie was diminished capacity. The juvenile court specifically identified the fact that Dr. Holttum's testimony had "no relevance and materiality at all" to diminished capacity because Dr. Holttum did not state whether K.A.B.'s dosage of fluoxetine prevented her from forming criminal intent. VRP (June 21, 2017) at 122. The juvenile court explained,

> The testimony of an expert witness when opinions are being offered requires that the opinions be stated in terms of probability; what is reasonably certain, and what is reasonably probable in the opinion of the expert. . . . There was no testimony from Dr. Holttum that the dosage of Fluoxetine that [K.A.B] was taking prevented her from forming a criminal intent; not even in terms of a possibility. His testimony simply did not address whether or not she had a diminished capacity to form a criminal intent by reason of the medication she was taking.

*Id.*

Dr. Holttum did not address whether K.A.B. was able to form the culpable mental state because Kleespie did not ask him to offer an opinion on that matter. But an expert opinion that

34

would have addressed this deficiency was available if Kleespie had taken the steps to obtain a forensic analysis prior to trial and to ask an expert the correct questions.

Dr. Trupin concluded that "KB had a mental disorder that impaired her ability to form the intent to commit a felonious custodial assault." Pers. Restraint Pet., App. C at 6 (Declaration of Dr. Eric Trupin). Dr. Trupin explained,

> KB had a bona fide mental illness. She has been impacted by multiple traumas which have intensified the manner in which she responds to interactions she perceived as threatening. KB's previous trauma has made her more likely to perceive the overaggressive behavior from detention staff as a serious threat to her well-being.
> KB did not have the cognitive capacity to effectively self-regulate her behavior because her emotional disorder has created a circumstance where she responds impulsively. Her lack of insight undermines her capacity to reflect on the consequences of her behavior. Effective treatment interventions can reduce the likelihood that a child would respond in a non-compliant manner. Those effective interventions were absent from the Grays Harbor response to this child's behavior. Children of her age, (particularly children who have experienced trauma and have co-occurring mental health problems) are developmentally prone to experience conflictual and threatening circumstances intensely and respond with intense displays of emotion.

*Id.* at 5-6. With regards to the incident on March 3, Dr. Trupin noted that "KB was not able to act rationally when she was handcuffed to a wall by the detention staff, left alone for a period of time, and then confronted by the staff who again handcuffed and restrained her." *Id.* at 10. Dr. Trupin repeated his conclusion, "In my opinion, to a reasonable psychological certainty, KB was not able to form the criminal intent required to be guilty of custodial assault under RCW 9A.36.100." *Id.* at 11.

In Dr. Holttum's declaration, he explains that he was provided with Dr. Trupin's declaration and agrees with its conclusions and would have so testified if he had the opportunity. Dr. Holttum stated that Dr. Trupin's conclusions went further than his own because Dr. Trupin's

35

conclusions were based on information that Dr. Holttum did not have access to prior to giving his testimony.

Kleespie could have elicited expert testimony that made a connection between either the dosage of fluoxetine or K.A.B.'s underlying mental health condition and K.A.B.'s ability to form the culpable mental state as required to maintain a diminished capacity defense. The juvenile court warned Kleespie of the deficiencies in her argument, but she made no attempt to rectify them. Had Kleespie taken reasonable steps to adequately prepare and present the diminished capacity defense, there is a reasonable probability that the result of the proceeding would have been different. *See Crace*, 174 Wn.2d at 840. The juvenile court remarked prior to issuing its ruling that "[t]here was no testimony from Dr. Holttum that the dosage of Fluoxetine that [K.A.B] was taking prevented her from forming a criminal intent; not even in terms of a possibility." VRP (June 21, 2017) at 123. Had Kleespie taken reasonable steps to adequately prepare and present the diminished capacity defense, Dr. Holttum or a different expert could have supplied that testimony. As a result, we conclude that K.A.B. was deprived of effective assistance of counsel.

CONCLUSION

We reverse K.A.B.'s conviction because she received ineffective assistance of counsel. We hold that her counsel's performance was deficient in preparing and presenting the diminished capacity defense. Counsel's performance prejudiced K.A.B. because diminished capacity was the only defense offered and, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding below would have been different.

We also reverse the finding of juvenile capacity because the juvenile court misapprehended the law when it stated that the ability to form criminal intent is irrelevant to a juvenile capacity

determination. On remand, we order the juvenile court to hold a new capacity hearing employing the correct legal standard.

We remand this matter to be heard before a different judge.[8]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

WORSWICK, J.

LEE, C.J.

---

[8] K.A.B. did not bring her claim that the DOs engaged in misconduct when they restrained her to the trial judge's attention though she makes this assertion now in her direct appeal. Because the trial judge serves as the juvenile court administrator and because this case is being remanded, his impartiality might reasonably be questioned in renewed proceedings in the juvenile court. Furthermore, the alleged victim in this case is a DO. As such, remand before a different trial judge is appropriate. We do not mean to suggest that the trial judge acted without impartiality in the proceedings below.